**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STEVEN C. DRIELAK,<br><br>            Plaintiff,<br><br>    v.<br><br>REGINA MCCARTHY,<br>ADMINISTRATOR OF THE<br>ENVIRONMENTAL PROTECTION<br>AGENCY<br><br>            Defendant. | Case No. 1:14-cv-01088 (CRC) |

**MEMORANDUM OPINION**

Plaintiff Steven Drielak, a veteran manager in the Environmental Protection Agency's criminal enforcement office, sued the agency for employment discrimination and retaliation. He claims he was passed over for a series of promotions and excluded from participating in various meetings and projects due to his age. He also contends that four of his agents were reassigned, and that he was denied further promotions, in retaliation for having filed a discrimination claim with the agency. The EPA has moved for summary judgment on both sets of claims. Finding that Drielak did not administratively exhaust his non-selection claims and that his exclusion from meetings and projects did not constitute materially adverse employment actions, the Court will grant summary judgment in favor of the agency on Drielak's age discrimination claims. And because Drielak has presented insufficient evidence to establish that the staff reassignments and later non-selections were motivated by retaliatory intent, the Court will grant summary judgment to the EPA on his retaliation claims as well. The case is thus dismissed in its entirety.

**I.	Background**

   A.	Factual Background

The EPA—through its Office of Criminal Enforcement, Forensics, and Training ("OCEFT")—investigates violations of federal environmental laws. Def.'s Statement of Undisputed Material Facts ("DSOF") ¶ 1. The agency hired Steven Drielak in 2003 as a GS-14-level law enforcement specialist within OCEFT. Id. Fifty years old at the time he was hired, Drielak had close to thirty years of law enforcement experience when he joined the EPA. Compl. ¶¶ 6–7, 10.

Drielak's tenure got off to a promising enough start. From 2003 to 2010, he climbed the agency's ranks and held various management positions, including Supervisory Program Manager, Supervisory Criminal Investigator, and eventually Director of the Homeland Security Division. DSOF ¶¶ 2, 4, 7. So valued was Drielak that the agency waived its maximum entry age of 37 for enforcement positions to enable him to become a Supervisory Criminal Investigator. Id. ¶ 2.

In 2010, however, Drielak's career progression began to stall. The agency attributes this plateau to a major reorganization of the enforcement office. In anticipation of this restructuring, the EPA eliminated the Homeland Security Division—which Drielak led at the time—and relocated its employees to other areas of the agency. Id. ¶¶ 10–12. OCEFT's then-Director, Fred Burnside, reassigned Drielak to lead the Field Operations Program. His primary responsibilities included managing the staff who collected evidence for OCEFT's Criminal Investigation Division; supervising the National Criminal Enforcement Response Team ("NCERT"), a group of agents who respond to national emergencies involving hazardous

materials; and overseeing the Protective Services Detail, which provides security to EPA employees during site visits and protects the Administrator. Id. ¶¶ 15–18.

In July 2011, the EPA named Henry Barnet as the new OCEFT Director, id. ¶ 22, and, six months later, named Matthew Morrison as OCEFT's Deputy Director, id. ¶ 32. Both Barnet and Morrison supervised Drielak in his position as the Director of the Field Operations Program until Drielak left the agency in March 2015.[1] DSOF ¶ 84. Contrary to the EPA's explanation for his lack of advancement after 2010, Drielak blames allegedly discriminatory and retaliatory personnel actions taken by his new supervisors and other agency officials. The following paragraphs detail the incidents that form the basis of Drielak's lawsuit.

1. <u>Non-Selections in 2010–2012</u>

Between March 2010 and September 2011, the agency selected five temporary OCEFT Acting Deputy Directors for successive three-month appointments. Compl. ¶¶ 16–25. Drielak applied but the agency selected a younger candidate each time. Id. OCEFT Administrators Cynthia Giles and Catherine McCabe selected the directors through a non-competitive, informal process. DSOF ¶¶ 25–26. In late 2011, Drielak applied to be the permanent Director of the Criminal Investigations Division through a competitive process. Id. ¶ 29. He made the short list of best qualified candidates, Compl. ¶ 55, but was not interviewed, DSOF ¶ 27. Dissatisfied with the quality of the candidates, Director Barnet left the position unfilled. DSOF ¶ 30. In January and April 2012, Drielak was not selected to serve as the temporary Acting Director of the Criminal Investigations Division. Id. ¶ 33. When the agency again announced an opening to be

---

[1] Although Drielak disputes the voluntariness of his retirement, both parties agree that Drielak retired from the agency in March 2015. Compare Pl.'s Statement of Material Facts ¶ 84 with DSOF ¶ 84.

3

the permanent Director of the Criminal Investigations Division in May 2012, Drielak did not apply. Compl. ¶ 58.

### 2. Exclusion from Meetings and Assignments

According to Drielak, from 2011 to 2012, he was excluded from a number of meetings and discussions regarding programs under his direct management. Compl. ¶ 27. He points to: (1) a June 2012 meeting between Deputy Director Morrison and representatives from the Office of Solid Waste and Emergency Response, where Drielak alleges NCERT was discussed; (2) a July 2012 meeting about NCERT between Directors Barnet and Morrison and managers within the Criminal Investigations Division; and (3) a series of discussions in late 2012 regarding OCEFT reorganization proposals that contemplated eliminating the Field Operations Program director position. Compl. ¶¶ 26–27, 36–37, 40, 50, 53. Drielak also complains that preparation of an August 2012 briefing paper on NCERT was assigned to one of his subordinates instead of him. The EPA does not dispute that Drielak did not attend every meeting where one of his programs may have been discussed. Rather, the agency stresses that many of these meetings occurred among higher-level management, and that OCEFT generally involved Drielak in discussions and emails about the ongoing reorganization. Def.'s MSJ 20–21; see also Def.'s MSJ Ex. 9–11, 13–14, 17. The EPA points out, for example, that Deputy Director Morrison emailed Drielak directly to solicit his input on the NCERT briefing paper noted above and to ask him to participate in its presentation. DSOF ¶ 67.

### 3. Performance Evaluations

Drielak's supervisors rated his annual performance by using the Performance Appraisal and Recognition System ("PARS"). Under PARS, employees are awarded the following ratings in order of excellence: Unsatisfactory, Minimally Satisfactory, Fully Successful, Exceeds

Expectations, and Outstanding. An Outstanding rating is defined as "reserved for the truly exemplary employee who demonstrates the highest degree of achievement," while as an Exceeds Expectations "signifies that the results achieved are clearly beyond what could be reasonably expected." Def.'s MSJ Ex. RIO-19. The overall rating averages individual ratings across four critical elements. Based on these parameters, former OCEFT Director Burnside awarded Drielak an "Outstanding" overall rating for his performance during the October 2009 to September 2010 performance period. Id. Burnside rated Drielak as Outstanding on three of the four critical elements and as Exceeds Expectations on the remaining critical element. Id. For the October 2010 to September 2011 performance period, current OCEFT Director Barnet evaluated Drielak's overall performance as "Exceeds Expectations." Id. He was rated as Exceeds Expectations on three of the critical elements and as Outstanding on the remaining element. Id. Drielak complains that the 2011 Exceeds Expectations rating was lower than what he deserved. Compl. ¶ 66. For the 2012 and 2013 performance periods, Barnet rated Drielak as Outstanding and as Exceeds Expectations respectively. DSOF ¶¶ 73, 77.

4. Reassignments and Non-Selections in 2014

Drielak supervised twelve special agents in the Field Operations Program. DSOF ¶ 80. In April 2014, Director Barnet reassigned four of these agents to the Criminal Investigations Division. Id. That same month, a special agent—who had been under the command of a 40-year-old OCEFT Director—was also reassigned to the Criminal Investigations Division. See DSOF ¶ 82; Def.'s MSJ 26. Six months earlier, a special agent from another OCEFT office had also been moved to the Criminal Investigations Division. Def.'s MSJ 26. Barnet attributed the transfers to the fact that the Criminal Investigations Division was "at or very close to a 10 year low for [its] special agent population," and explained that a larger staff was needed for casework.

Def.'s MSJ Ex. RIO-2014-B.  After Drielak retired in March, the agency continued realigning personnel, transferring the entire NCERT team and all of the Field Operation Program's remaining special agents to the Criminal Investigation Division in June 2015.  DSOF ¶¶ 86–87.  Drielak states that he applied to other agency positions in 2014 but was not selected because he had to report that his program was decimated.  Compl. ¶ 79.  Agency records show, however, that Drielak last applied for a position in 2012.  DSOF ¶ 88.

5. EEO Administrative Proceedings

Drielak first contacted an EPA Equal Employment Opportunity ("EEO") counselor on August 22, 2012.  DSOF ¶ 62.  On December 4, 2012, he lodged his first official EEO Complaint with the EPA's Office of Civil Rights ("OCR").  Def.'s MSJ Ex. 26.  Drielak alleged, in 16 numbered claims, that he suffered from workplace harassment and disparate treatment.  Id.  The OCR decided to investigate seven of his disparate treatment claims, but it rejected the rest as either untimely—because the alleged incident occurred more than 45 days prior to initial EEO contact, see 29 C.F.R. § 1614.105(a)(1–2)—or for failing to state a claim.  Def.'s MSJ Ex. 26.  An EEO Specialist within OCR investigated the complaint and delivered a Report of Investigation to Drielak on January 30, 2014.  Decl. Bassie McCain ¶¶ 1, 6.  Following office practice, she *only* sent the report to Drielak and an attorney in the Employment Law Practice Group, not to any managers.  Id. ¶ 8.  Drielak filed a second EEO complaint with the OCR on May 14, 2014 alleging that Director Barnet retaliated against him for his prior EEO activity by reassigning four of his special agents to the Criminal Investigations Division.  Def.'s MSJ Ex. 27.  The second EEO complaint did not allege any retaliatory acts besides the reassignments.  Id.

B.      Procedural Background

In June 2014, Drielak filed suit in this Court against Regina McCarthy, in her official capacity as Administrator of the EPA. The complaint only alleged violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C § 621, *et. seq*. ("ADEA"). Drielak later amended his complaint in November 2014 to include two retaliation claims—based on the reassignments of his staff and his non-selections in 2014—under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et. seq*. ("Title VII"). The parties have completed discovery and the EPA now moves for summary judgment on both the age discrimination and retaliation claims.

**II.     Legal Standards**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to demonstrate an "absence of a genuine issue of material fact" in dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In ruling on a motion for summary judgment, a court accepts as true the nonmovant's evidence and draws all reasonable inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The nonmovant may not, however, rely on mere allegations or conclusory statements. Veitch v. England, 471 F.3d 124, 134 (D.C. Cir. 2006).

The ADEA prohibits employers from "discharg[ing] an[] individual . . . because of such individual's age." 29 U.S.C. § 623. Title VII protects employees who have opposed "unlawful employment practice[s]" from employer retaliation. 42 U.S.C. § 2000e-3(a). Courts consider both discrimination and retaliation claims using the three-step McDonnell Douglas framework. See, e.g., Mokhtar v. Kerry, 83 F. Supp. 3d 49, 70 (D.D.C. 2015) ("The McDonnell Douglas

framework applies to both Title VII and ADEA claims." (citing Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006))). Under this framework, an employee must first establish a *prima facie* case by showing that: "(1) he is a member of a protected class; (2) he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination." Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007). For age discrimination claims, the plaintiff must belong to a statutorily protected age group and have been disadvantaged in favor of a younger person. Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999). Likewise, a *prima facie* case of retaliation requires the plaintiff to demonstrate that (1) he engaged in protected activity; (2) the employer took a materially adverse action against her; and (3) the employer took the adverse action because of the employee's protected activity. Bridgeforth v. Jewell, 721 F.3d 661, 663 (D.C. Cir. 2013); Jones v. Wash. Times, 668 F. Supp. 2d 53, 59 (D.D.C. 2009). Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer "to articulate a legitimate, nondiscriminatory and/or non-retaliatory reason for the adverse employment action; and if the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the offered non-discriminatory reason was, in fact, pretext for a prohibited reason." Mokhtar, 83 F. Supp. 3d at 70 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973)).

### III.   Analysis

The EPA seeks summary judgment as to Drielak's employment discrimination and retaliation claims. In support of its motion, the agency asserts that (1) Drielak has not administratively exhausted his non-selection claims, which precludes him from raising them now; (2) he has not shown that being excluded from meetings constituted adverse employment

actions; and (3) he has not presented evidence of a causal link between his protected activity and the alleged retaliation.  The Court will address each of the agency's contentions in turn.

### A. Administrative Exhaustion

The agency maintains that Drielak was either untimely in reporting certain claims to an EEO counselor or that he bypassed the administrative process entirely.  Both would bar him from bringing those claims in court.  The ADEA provides federal government employees two avenues for judicial relief.  See Rann v. Chao, 346 F. 3d 192, 195 (D.C. Cir. 2003).  First, an employee can proceed directly to federal court so long as he has notified the EEOC of his intent to sue within 180 days of the alleged discriminatory act and at least 30 days before commencing his suit.  Id. (citing 29 U.S.C. §§ 633a(c), (d)).  Second, an employee can follow the agency's EEO administrative process and proceed to federal court if dissatisfied with the results.  Id. at 194.  The administrative process requires an employee to consult with an EEO counselor within "45 days of the date of the matter alleged to be discriminatory" and before filing a formal complaint against the agency.  29 C.F.R. § 1614.105(a).  While these timeliness and exhaustion requirements are not jurisdictional, the D.C. Circuit has treated them like a statute of limitations. See Colbert v. Potter, 471 F.3d 158, 167 (D.C. Cir. 2006).  Therefore, "a court may not consider a discrimination claim that has not been exhausted in this manner absent a basis for equitable tolling." Steele v. Schafer, 535 F.3d 689, 693 (D.C. Cir. 2008); see also Johnson v. Vilsack, 815 F. Supp. 2d 221, 226 (D.D.C. 2011) (citing Rann, 346 F.3d at 195) ("Failure to adhere to at least one of these alternatives will bar claims in the district court").

In the interest of clarity, the Court will review the relevant dates.  The agency did not select Drielak for the OCEFT Acting Deputy Director position at various times from March 2010 to September 2011.  Director Barnet awarded Drielak a PARS rating of Exceeds Expectations in

October 2011, which Drielak contends was below the Outstanding rating he deserved. At the end of 2011, the agency decided not to interview Drielak for the permanent Criminal Investigations Division Director position although he was on the "Best Qualified" list. Again, in April 2012, Director Barnet did not select him to serve as the Acting Director of the Criminal Investigations Division. Drielak first contacted an EEO Counselor to discuss the incidents outlined above on August 22, 2012. He filed an official complaint against the EPA on December 4, 2012. After four of his special agents were reassigned in 2014, Drielak filed a second EEO complaint on May 14, 2014 alleging retaliation. That complaint listed the forced transfer of Drielak's agents as the only evidence of retaliation. Drielak amended his complaint in this Court in November 2014 to include two claims of retaliation: that his agents were reassigned and that he was not selected for agency positions in 2014.

There is no evidence that Drielak ever sent the EEOC a notice of his intent to sue, so the first avenue of exhaustion does not apply here. Def.'s Mem. Supp. Mot. Summ. J. ("MSJ") 9. And while Drielak attempted to invoke the administrative process by contacting an EEO counselor at the EPA, many of the discriminatory acts he reported occurred months or years before he first did so. Id. at 10–11. In applying the administrative exhaustion doctrine to individual acts of discrimination, the Supreme Court has held that "[e]ach discrete discriminatory act"—like *failures to promote*, denials of transfer requests, or refusals to hire—"starts a new clock" and that time-barred acts are no longer actionable. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113–14 (2002). Each of Drielak's non-selections from 2010–2012, along with his 2011 PARS rating, was a discrete act that occurred more than 45 days before Drielak consulted with an EEO Counselor. Id. In order to preserve his claims and remedies, Drielak should have communicated each incident to an EEO Counselor within 45 days of its occurrence.

Drielak does not dispute that he failed to comply with the 45-day exhaustion deadline. Instead, he requests that the Court equitably toll the deadline to save his untimely claims. Equitable tolling is to be used "sparingly," Morgan, 536 U.S. at 113, and "only in extraordinary and carefully circumscribed instances." Chisolm v. Lanier, 891 F. Supp. 2d 112, 116 (D.D.C. 2012) (citing Mondy v. Sec'y of the Army, 845 F.2d 1051, 1057 (D.C. Cir. 1988)). In evaluating claims of disparate treatment, some courts have applied a "reasonable suspicion" standard, tolling the 45-day limit if the employee affirmatively shows that he did not know or could not have known about the discrimination at the time it occurred. See Aceto v. England, 328 F. Supp. 2d 1, 5 (D.D.C. 2004) (citing 29 C.F.R. § 1614.105(a)(2)). But this does not permit a plaintiff "to wait until he has direct proof of the allegedly discriminatory actions"; rather, "the 45-day clock begins when a plaintiff first suspects discrimination, not when he has obtained the 'supportive facts' necessary to prosecute a discrimination charge." Johnson v. Gonzales, 479 F. Supp. 2d 55, 59 (D.D.C. 2007) (quoting Paredes v. Nagle, 1982 WL 319, at *4 (D.D.C. Jan 17, 1982)).

Drielak contends that he did not have a reasonable suspicion of age discrimination until late August 2012, when a colleague told him that Deputy Director Morrison had mentioned a candidate's looming retirement while interviewing applicants for another position. Pl.'s Opp'n Def.'s MSJ ("Opp'n") 9–10. Yet Drielak's own admissions belie this argument. When asked during the EEO investigation why he believed he was discriminated against, Drielak responded that his belief was based on:

> [A] pattern comprised of many instances, as described in this affidavit, where I have been denied promotional opportunities, had my position removed from proposed organizational charts or had been excluded from discussions, meeting, and decisions regarding my own national program responsibilities. In each instance of promotion opportunity denial and in each instance of exclusion, a younger and less qualified candidate, colleague or subordinate was selected or utilized over me.

11

Def.'s MSJ Ex. ROI-A. Drielak also provided details—candidates' ages and qualifications—to support his belief that he was routinely passed over for younger and less-experienced applicants, some of whom had been his subordinates. See id. In addition, Drielak acknowledged that he thought his 2011 PARS rating was unwarranted and that upon receiving it in late 2011 he asked his supervisors at that time why he was rated below Outstanding. Id. While Drielak, like most employment discrimination plaintiffs, might not have had incontrovertible proof of discrimination, he was clearly aware of the fact that he was repeatedly not selected for positions in favor of younger candidates. Drielak's knowledge of selected candidates, doubts about his ratings, and the sheer quantity of reported incidents all strongly suggest that he had a "reasonable suspicion" of discrimination well before he contacted the EEO counselor in August 2012. Given that equitable tolling only applies "in extraordinary and carefully circumscribed instances," the facts of this case do not warrant it. Mondy, 845 F.2d at 1057. Nor do any other circumstances justify its application.[2] Accordingly, the Court concludes that Drielak's claims involving his denials of promotions in 2010–2012 and his 2011 annual rating were not properly exhausted and cannot survive summary judgment.[3]

---

[2] Examples of extraordinary circumstances that could warrant equitable tolling include: efforts by the defendant to delay the plaintiff from taking action, the plaintiff's lack of awareness of the time requirements, and the plaintiff's inability to uncover vital information despite diligent efforts. See Chisolm, 891 F. Supp. 2d at 116 (citing Mondy, 845 F.2d at 1057). None applies here.

[3] The agency also argues that Drielak's 2014 non-selection retaliation claim was improperly exhausted because Drielak did not include it in his second EEO complaint. Def.'s MSJ 11–12. Drielak has not provided any details whatsoever around his 2014 non-selections to explain how they relate to his original complaint regarding the reassignments of his agents. He cannot meet his burden of showing that the 2014 non-selections were properly exhausted. Regardless, Drielak's 2014 non-selection claim cannot survive summary judgment because he fails to establish that they were motivated by retaliatory intent. See infra Section III.C.2.

B.    Disparate Treatment

Drielak's surviving discrimination claims—those that were properly exhausted—are premised on his exclusion from meetings in late 2012 and the denial of an opportunity to work on a briefing paper for the deputy administrator.

Generally, once a plaintiff has offered facts making up a *prima facie* case of discrimination, the court will focus on determining if there was discriminatory intent. For discriminatory intent to be the relevant focus, however, the plaintiff must first establish that the employer's actions were indeed materially adverse. See Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008) ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not-*and should not*-decide whether the plaintiff actually made out a prima facie case"); Ortiz-Diaz v. U.S. Dep't of Hous. & Urban Dev., 2016 WL 4087942, at *3 (D.C. Cir. Aug. 2, 2016) (affirming the grant of summary judgment because the employee did not establish that he suffered an adverse action). A termination or failure to hire or promote is an adverse action. See Holcomb v. Powell, 433 F.3d 889, 902 (D.C. Cir. 2006). Other discrete incidents with "materially adverse consequences" also qualify if they "affect[] the terms, conditions, or privileges of employment or future employment such that a trier of fact could find objectively tangible harm." Id. But "purely subjective injuries, such as dissatisfaction with a reassignment, public humiliation, or loss of reputation," id. (quoting Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002)), and "[p]ersonality conflicts at work that generate antipathy and snubbing by supervisors" do not, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

13

The EPA argues that Drielak's exclusion from meetings and work projects do not constitute materially adverse employment actions. The Court agrees. They did not cause a change in Drielak's job responsibilities or salary. Def.'s MSJ 14 (citing Def.'s MSJ Ex. ROI-C 11). Nor did they affect his grade level or supervisory duties. Id. Moreover, the agency involved Drielak in plenty of other meetings and communications discussing his programs and general reorganization proposals. DSOF ¶¶ 36–40, 46–47, 54. And although the agency did not involve Drielak at the beginning of every project, it solicited his comments at later stages—as with the NCERT briefing paper. Drielak insists that being excluded "left him ineffectual as a manager and impacted [] his job performance." Pl.'s Opp'n 14. But that does not line up with his 2012 annual PARS rating of "Outstanding" or the cash reward he received in December 2012. DSOF ¶¶ 73–74. Other courts to consider this issue have likewise found that exclusion from meetings—without a more tangible impact on an employee's responsibilities or salary—is not a materially adverse employment action. See, e.g., Kurian v. Forest Hills Hosp., 962 F. Supp. 2d 460, 470 (E.D.N.Y. 2013); Wilcoxon v. DECO Recovery Mgmt., LLC, 925 F. Supp. 2d 725, 731 (D. Md. 2013); Casey v. Mabus, 878 F. Supp. 2d 175, 184 (D.D.C. 2012); Mabry v. Neighborhood Defender Serv., 769 F. Supp. 2d 381, 399 (S.D.N.Y. 2011); Hampton v. Diageo N. Am., Inc., 2008 WL 350630, at *9 (D. Conn. Feb. 7, 2008). Because Drielak has not established that he suffered adverse employment actions through being excluded from meetings and projects, the Court will grant summary judgment for the EPA on Drielak's remaining discrimination claims.[4]

---

[4] Because the Court finds that Drielak has either failed to exhaust his discrimination claims or failed to show that he suffered an adverse personnel action, the Court need not dwell on the agency's argument that all of its actions were based on legitimate, non-discriminatory justifications. The Court would simply note that the record amply supports that OCEFT was

C.  Retaliation

Title VII forbids an employer from retaliating against an employee because the employee engaged in protected activity by opposing unlawful employment practices or bringing discrimination charges under Title VII.  42 U.S.C. § 2000e–3(a); see also Allen v. Johnson, 795 F.3d 34, 38 (D.C. Cir. 2015).  To establish a retaliation claim, a plaintiff must prove three elements:  that he engaged in protected activity, that his employer took a materially adverse employment action against him, and that there is a causal link between the adverse action and the protected activity.  Id. at 39 (citing McGrath v. Clinton, 666 F.3d 1377, 1380 (D.C. Cir. 2012)).  The agency does not dispute that Drielak engaged in protected activity by filing an EEO complaint alleging that he had suffered workplace harassment and unlawful discrimination.  It insists instead that the reassignments of four agents from Drielak's command was not a materially adverse action, that no causal link exists between his complaint and the reassignments, and that Drielak cannot overcome the legitimate explanation offered by the agency for the reassignments.

1.  Materially Adverse Action

As discussed above, Drielak's exclusion from meetings did not constitute an adverse action because it did not "affect the terms, conditions, or privileges of [his] employment."  See supra Section III.B.1.  The EPA urges the Court to apply the same adverse action standard with respect to Drielak's retaliation claim.  Def.'s MSJ 15 ("[T]heir reassignment did not cause Plaintiff any change to the terms or conditions of his employment").  But the standards

---

undergoing a major reorganization during and after Drielak's tenure, and that many other managers, besides Drielak, were affected by it.  The Court also observes that Drielak has offered scant evidence of pretext to rebut the agency's age-neutral explanations of its actions.

15

governing the two claims are distinct. See Jones v. Castro, 2016 WL 777917, at *5 (D.D.C. Feb. 29, 2016) (citing Burlington N., 548 U.S. at 67). A materially adverse action in a retaliation claim is an action that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." Burlington N., 548 U.S. at 68; see also Mogenhan v. Napolitano, 613 F.3d 1162, 1165–66 (D.C. Cir. 2010).

Drielak has established that four of his twelve agents were reassigned in one fell swoop, a 33% reduction of his special agent team. DSOF ¶ 80. Moreover, Drielak complained that these reassignments prevented him from "investigat[ing] environmental crime scenes, an important job duty." Compl. ¶ 83. He further alleges that the reduction in his team contributed to the decimation of his program, which affected prospective job opportunities. Pl.'s Opp'n 12. The agency failed to respond to Drielak's assertion that the reassignments significantly affected his supervisory responsibilities and his ability to perform work-related tasks. A genuine factual issue therefore remains as to whether such reassignments would dissuade a reasonable employee from making charges against an employer. See Patterson v. Johnson, 505 F.3d 1296, 1299 (D.C. Cir. 2007); Czekalski v. Peters, 475 F.3d 360, 365 (D.C. Cir. 2007) ("Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question"). Drawing all inferences in favor of the non-movant, the Court thus concludes that Drielak has sufficiently established that the reassignments of four special agents could be a materially adverse action for purposes of his retaliation claim.

      2.      Causation

Drielak must also prove that a causal link existed between his protected activity and the EPA's later adverse actions. Holcomb, 433 F.3d at 903. An employee can establish causation by showing "the employer had knowledge of the employee's protected activity, and . . . the

adverse personnel action took place shortly after that activity." Id. (quoting Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985)) (internal quotation marks omitted).  If temporal proximity is the only evidence supporting causation, however, the temporal connection must be "very close." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001); Hamilton v. Geithner, 666 F.3d 1344, 1357 (D.C. Cir. 2012).  Courts have ordinarily required the two events to have occurred, at most, within three months of one another.  Clark Cty. Sch. Dist, 532 U.S. at 273–74 (citing cases in which 3 or 4 months between events was found to be insufficient evidence of causality). Conversely, an adverse action occurring substantially later could negate a causal link.  Id. (holding that a 20-month gap between events suggested no causality).  A plaintiff may also establish causation through direct or circumstantial evidence of his supervisors' intent.  See, e.g., Kilby-Robb v. Duncan, 2015 WL 106956, at *9 (D.D.C. Jan. 8, 2015).

In contesting causation, the EPA hones in on the 15-month gap between Drielak's initial EEO complaint in December 2012 and the reassignments of his agents in April 2014.  Def.'s MSJ 24–25.  Drielak responds that the gap was in fact much shorter.  Pl.'s Opp'n 21.  He claims that the results of the EEO investigation—containing affidavits from Drielak's colleagues—were delivered to EPA senior managers in early 2014.  Id.  But Drielak has not produced any evidence to support a finding that his senior managers received or were aware of the report.  The agency, in contrast, has submitted a declaration from the EEO Specialist who conducted the investigation, who avows that, in line with office practice, she only shared the results with Drielak and the EPA's General Counsel's office.  Decl. Bassie McCain ¶¶ 1, 8.  By his own admission, Drielak informed his supervisors of his pending EEOC complaint in September 2012. Def.'s MSJ Ex. ROI-A 131, 17.  Both of his supervisors provided affidavits in connection with the investigation in September 2013.  Def.'s MSJ Ex. ROI-B 1, ROI-C 1.  Drielak reports no

adverse actions occurring during either of those time periods. At best, the time between his supervisors' involvement in the investigation and the reassignments was seven months, almost double the amount of time a court ordinarily requires to find causation. See Castro, 2016 WL 777917 at *11 (citing Woodruff v. Peters, 482 F.3d 521, 529 (D.C. Cir. 2007)) ("No inference of causation is possible where it was more than three months between his final protected activity and the adverse action—and almost a year between Plaintiff's initial protected activity and the adverse action.").

Nor has Drielak provided additional evidence to support an inference that the reassignments happened because of his protected activity. He cannot point to any comments by supervisors or coworkers suggesting a retaliatory intent. And no adverse actions were taken against his colleagues who were interviewed during the investigation. In sum, the temporal link alone is too attenuated to support causation, and no other evidence has been offered to strengthen it.[5] The Court thus concludes that Drielak has not established a *prima facie* case for his retaliation claim.[6]

---

[5] In his amended complaint, Drielak asserts that he was not selected for positions in 2014 after his agents were reassigned. Compl. ¶ 79b. He presents this as a separate claim of retaliation but connects his 2014 non-selection with the reassignments: "[H]is program was decimated by Mr. Barnet's force-transfer of the special agents. In other words, Mr. Drielak has claimed that Mr. Barnet removed special agents from his supervision in an effort to not select him for positions in 2014." Pl.'s Opp'n 12. Even assuming that the reassignments were part of a broader scheme, Drielak's 2014 non-selections, which occurred much later, are still more attenuated than his reassignment claim and thus also fail to suggest retaliatory intent.

[6] Because Drielak has failed to establish the elements critical to a retaliation claim, there is no need to move on to the second step of the McDonnell Douglas analysis. The Court does note, however, that the EPA's explanation for reassigning Drielak's agents is consistent with its earlier justification regarding the agency's ongoing reorganization efforts, which the Court found to be credible.

## IV. Conclusion

For the reasons stated above, the Court will grant the Defendant's motion for summary judgment as to Drielak's disparate treatment and retaliation claims. An Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: September 19, 2016